**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KURT MOHR,

        Plaintiff,

v.

MICHIGAN DEPARTMENT OF
CORRECTIONS,

        Defendant.

CIVIL CASE NO. 04-60119
HON. MARIANNE O. BATTANI

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS**

**I.     INTRODUCTION**

Before the Court is Defendant's Motion for Summary Judgment and Motion to Dismiss (Doc. #12). Plaintiff filed suit against the Michigan Department of Corrections ("MDOC") alleging, *inter alia*, that he was denied an employment opportunity because of his disability in violation of the Americans with Disabilities Act ("ADA") and the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"). Plaintiff's Complaint also alleges that Defendant committed the following torts all based on the denial of employment: breach of contract, intentional infliction of emotional distress, and tortious interference with a business relationship. Defendant filed the instant motion, contending that Plaintiff cannot establish a *prima facie* case of disability discrimination because he is not a qualified individual with a disability and that Plaintiff's tort claims are barred by the Eleventh Amendment.

1

Plaintiff began employment with the State of Michigan ("State") as a stock clerk with the Liquor Control Commission in 1986. Privatization of the Commission led to his layoff on January 21, 1997, but he was subsequently recalled and started work for the Michigan Department of Corrections (MDOC) as a Storekeeper Supervisor 8 at the Gus Harrison Correctional Facility in Adrian, Michigan, on May 30, 1999. Plaintiff's job required him to keep the inmates' store stocked with merchandise, supervise processing of inmates' orders, control inventory against theft, and supervise six state staff and eight to twelve inmates who worked at the store. Although Plaintiff's performance evaluations were satisfactory overall, his supervisor noted that his organizational skills needed improvement. Plaintiff liked his job because it kept him busy, but "encountered difficulties getting the job done the way I wanted to do it and the way they expected me to do it." Dep. of Mohr, at 21, 25. He disliked the pressure of his work, and characterized his supervisors as nagging him about shortages in inventory and expected zero inventory loss, which Plaintiff found impossible to control. Id., at 22, 25, & 26.

Plaintiff's psychiatric and psychological impairment allegedly dates back to 1992. At that time, Plaintiff's now ex-wife encouraged him to seek help. However, Plaintiff declined to do so because he felt nothing was wrong.

Beginning in December 1999, Plaintiff began taking a series of medical leaves of absence. Plaintiff took his first medical leave, due to high blood pressure, on December 3, 1999. It continued for approximately six weeks until January 17, 2000.

On January 22, 2001, Plaintiff reported to MDOC a "disabling injury" of a mental and emotional nature. Plaintiff attributed his mental impairments to stress caused by the "day to day buildup of job pressure; and daily deadlines; Lack of training, [and] possible inexperience on my

2

part." Dep. of Mohr, Ex. 9, Employee Accident Report. This disabling injury led to his second medical leave, and was attributed to stress and anxiety. It spanned approximately thirteen weeks between February 6, 2001, and May 14, 2001.

After Plaintiff returned from his second medical leave, a fellow employee at MDOC suggested that Plaintiff see psychotherapist Dr. Robert Farra. Dr. Farra took charge of Plaintiff's treatment, and on April 25, 2001, diagnosed Plaintiff with Severe Recurrent Major Depressive Disorder. Plaintiff entered group therapy for approximately eight weeks upon the suggestion of Dr. Farra.

Plaintiff stated that while he was working at the Gus Harrison facility, he slept only three or four hours a night, and was unable to make decisions at work required by his supervisory position. Dr. Farra noted in mid-2002 that Plaintiff "is experiencing depression in the form of: diminished interest in or enjoyment of activities, Psychomotor agitation, insomnia, no drive, poor concentration and indecisiveness, feelings of worthlessness, low frustration tolerance, and low
self esteem. He is angry about everything." Pl.'s Ex. 3, Records of Dr. Farra. Plaintiff was taking sleep medication and an antidepressant prescribed by his psychiatrist, Dr. Ittiara.

The third medical leave, involving a fractured hand incurred in a non-work related activity, took place on November 24, 2001, and lasted until December 4, 2001. He took yet another medical leave of absence for the approximately seventeen weeks between January 14, 2002, and April 6, 2002, for anxiety, stress, and suicidal thoughts. Plaintiff's divorce from his wife was finalized in January 2002. As a part of the divorce settlement, Plaintiff lost the home he had built at the beginning of his marriage. These occurrences exacerbated his stress.

3

Plaintiff's last official day of work at Gus Harrison Correctional Facility was January 10, 2002. Dr. Ittiara noted from January 2002 through August 2002 that Plaintiff was "unable to work any job at this time." Pl.'s Ex. 4, Records of Dr. Ittiara.

When he neared the exhaustion all of his medical leave entitlements under the Civil Service Rules and the Family Medical Leave Act, he was informed of his options by Sharon Opel, Personnel Officer at Gus Harrison, which included: (1) return to work by April 7, 2002, with no restrictions or restrictions that could be reasonably accommodated; (2) a waived rights leave of absence; (3) a disability retirement; or (4) resignation. On March 18, 2002, Plaintiff informed Opel that he wanted to take a waived rights leave of absence.[1] The waived rights leave was approved by the Gus Harrison Warden, David Jamrog.

Per MDOC rules, a former employee on a waived rights leave of absence who wishes to return to employment at a correctional facility must apply for a posted position, be selected as a candidate for an interview, and pass a background review by the MDOC Department of Human Resources Officer. After the background reviews are forwarded to the Deputy Director of the MDOC, an interview panel at the correctional facility is convened and all selected candidates are interviewed using standardized questions. Next, references supplied by the candidate are checked by the hiring manager of the interview panel. After checking the candidate's references, the interview team at a correctional facility drafts a memorandum summarizing the top three candidate choices and recommending one of the candidates for a position. The warden decides

---

[1] A waived rights leave of absence permits a State employee to retain his seniority if he secures future employment with the State within one year of the date of the leave. A waived rights leave is offered to an employee who cannot work for a reason beyond his control.

4

whether or not he concurs with the choice of the interview panel. No preference is given to candidates that are former employees on a waived rights leave.

Next, the warden seeks approval to hire the candidate from the Regional Prison Administrator in his chain-of-command. In the case of a former employee on a waived rights leave of absence, approval must also be given by the Personnel Director, the appropriate Deputy Director, and the Director of the Department of Corrections. If the candidate receives approval up the chain-of-command through the Director of the Department of Corrections, the candidate is further required to pass a physical examination and a drug screen before a formal offer of employment is tendered to the candidate.

After conferring with his psychotherapist Dr. Farra, Plaintiff decided to return to work within one year of taking the waived rights leave of absence to protect his seniority. On September 26, 2002, Plaintiff submitted a resume and cover letter for a posted Storekeeper 7 position at Huron Valley Correctional Facility ("HVCF"). Plaintiff believed his return as a Storekeeper Supervisor 7 versus Storekeeper Supervisor 8 would allow him to be "a worker as opposed to a supervisor." Dep. of Mohr, at 59. He submitted a Pre-Employment Application for the position on November 21, 2002. Anita Wilson, personnel management assistant, contacted all the selected candidates, including Plaintiff, to set up interview times and dates, and prepared the employment materials submitted by the candidates for the interview panel. Wilson stated in her deposition that, "Mr. Mohr seemed like a very impressive, qualified candidate in my opinion." Dep. of Wilson, at 66. Moreover, Wilson testified that a "state printout of [employment] history" reflected no disciplinary action or written reprimands of Plaintiff in his employment with MDOC. Id., at 58-59.

The interview panel consisted of Dean Batkins, Business Manager for HVCF, Jeff Burkhart, Warehouse Supervisor at HVCF, and Karen Whalen, Administrative Assistant to Warden Kenneth Romanowski.  The same interview questions, drafted by the panel, were asked of each candidate and the candidates were graded on their responses based on criteria set up by the panel.  However, during the interview, Burkhart inquired about Plaintiff's reason for leaving Gus Harrison Correctional Facility.  Plaintiff stated that he left because of the stress, anxiety, and depression that led to his numerous medical leaves, and ultimately his waived rights leave of absence.  The interview panel selected Plaintiff as one of the top three candidates, checked the references supplied by the candidates, and recommended Plaintiff to Warden Romanowski for first consideration for hire to the Storekeeper 7 position.

In accordance with MDOC hiring practices, Warden Romanowski wrote a memorandum requesting approval to hire Plaintiff to Regional Prison Administrator Barbara Bock and Elick Shorter, Personnel Officer at HVCF.  Bock recommended that Romanowski discuss Plaintiff with his previous supervisor at Gus Harrison.  Romanowski then spoke with Warden David Jamrog from Gus Harrison, who advised strongly against hiring Plaintiff.  Jamrog told Romanowski that Plaintiff had problems getting along with his supervisors and co-workers.  Although Warden Jamrog did not go "in depth," he revealed to Warden Romanowski that he had concerns about Plaintiff's "personal skills."  Dep. of Romanowski, at 18.  Warden Romanowski further testified that he did not follow up with any of Plaintiff's old supervisors; nor did he review Plaintiff's personnel file after Warden Jamrog's telephone call.  Id., at 19.  Warden Romanowski then contacted Batkins and informed him that Plaintiff would not be a "good selection for us."  Id., at 33.  Romanowski then advised Wilson that MDOC was not going to

6

make a formal offer of employment to Plaintiff and that the Director was not going to approve Plaintiff's rehire.  Plaintiff was told by Anita Wilson that the Director of MDOC was new to his position and that he wouldn't hire anyone off a waived rights leave of absence.  Dep. of Mohr, at 83.  The position was ultimately filled with the second choice candidate.

Prior to the filing of his lawsuit, Plaintiff filed a complaint with the Michigan Department of Civil Rights alleging disability discrimination on January 23, 2003.  The EEOC investigated the charge, found reasonable cause to believe that the allegations of discrimination based on disability were true, and attempted unsuccessfully to achieve a voluntary resolution of the charge.  Plaintiff's complaint was referred to the U.S. Department of Justice, which determined not to file suit against MDOC.  Plaintiff received a right to sue letter from the EEOC and initiated the instant suit.

## II.     STANDARD OF REVIEW

"A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists."  DLX, Inc. v. Kentucky, 381 F.3d 511, 516 (6th Cir. 2004).  A district court has no subject matter jurisdiction over a claim if that claim is barred by the Rooker-Feldman doctrine, *res judicata*, or by the Eleventh Amendment.  Id.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

As the United States Supreme Court has ruled:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. See Hager v. Pike County Bd. of Educ., 286 F.3d 366, 370 (6th Cir. 2002). "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party carries that burden, the burden then shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. FED. R. CIV. P. 56(e); Chao v. Hall Holding Co., 285 F.3d 415, 424 (6th Cir. 2002). "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256 (1986). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. See Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Sagan v. U.S., 342 F.3d 493, 497 (6th Cir. 2003).

"A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984)(citation omitted)(quoting BLACK'S LAW DICTIONARY 881 (6th ed.

1979)).  To create a genuine issue of material fact, the nonmovant must do more than present some evidence on a disputed issue.

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Anderson, 477 U.S. at 249-50.  "No genuine issue of material fact exists when the 'record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  Michigan Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th Cir. 2002)(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  The evidence itself need not be the sort admissible at trial.  Tinsley v. General Motors Corp., 227 F.3d 700, 703 (6th Cir. 2000).  However, the evidence must be more than the nonmovant's own pleadings and affidavits.  Smith v. Campbell, 250 F.3d 1032, 1036 (6th Cir. 2001).  The mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the non-movant.  Anderson, 477 U.S. at 252.

### III.   ANALYSIS

#### A.   Plaintiff's Tort Claims

The Eleventh Amendment "bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments, . . . by citizens of another state, foreigners or its own citizens.  The amendment also bars suits for monetary relief against state officials sued in their official capacity.  However, the amendment does not preclude actions against state officials sued in their official capacity for prospective injunctive or declaratory relief."  Thiokol Corp. v. State of Mich. Dep't of Treasury, 987 F.2d 376, 381 (6th Cir. 1993)(citations omitted).  "[ T]he States' constitutional immunity from suit prohibits all state-law claims filed against a State in federal

court, whether those claims are monetary or injunctive in nature." Ernst v. Rising, 427 F.3d 351, 368 (6th Cir. 2005).

> The Eleventh Amendment has no application under two circumstances: 1) where a state has itself waived its immunity from federal suit; and 2) where Congress has abrogated the states' immunity. . . . .
> Congress may override the states' Eleventh Amendment immunity when it acts pursuant to its powers under the Fourteenth Amendment, or pursuant to the Commerce Clause. The Supreme Court has set forth and adhered to a strict test for Congressional elimination of state sovereignty. This test requires unequivocal and textual support:
>> Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.

Id. (citations omitted).

Because the State has not waived its Eleventh Amendment Immunity, Plaintiff is not suing state officers in their official capacity, Plaintiff does not seek prospective injunctive relief, and Congress has not overridden the states' immunity pursuant to the Fourteenth Amendment or the Commerce Clause in relation to Plaintiff's common law tort claims, the Eleventh Amendment bars Plaintiff's breach of contract, intentional infliction of emotional distress, and tortious interference with a business relationship claims.

### B. Plaintiff's PWDCRA and ADA Claims

The Michigan PWDCRA is substantially identical to the ADA, and Michigan courts rely on ADA decisions in resolving claims under the state law. See Smith v. Chrysler Corp., 155 F.3d 799, 804 (6th Cir.1998). Thus, the "resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim." Cotter v. Ajilon Svcs., Inc., 287 F.3d 593, 597 (6th Cir. 2002). To state a claim under the ADA, a plaintiff must establish that he: 1) is a disabled person within the meaning of the Act; 2) is qualified to perform the essential

functions of his job with or without reasonable accommodation; and, 3) suffered an adverse employment decision because of his disability. McKay v. Toyota Motor Mfg., U.S.A., Inc., 110 F.3d 369, 371 (6th Cir. 1997) (citing Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1179 (6th Cir. 1996)).

In the first step of establishing a *prima facie* case, a plaintiff must show that he is a qualified person with a disability as defined by the ADA. A disability is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2). To qualify as disabled, a claimant must show that the limitation on a "major life activity" is "substantia[l]." 42 U.S.C. § 12102(2)(A).

> According to the EEOC regulations, "substantially limit[ed]" means "[u]nable to perform a major life activity that the average person in the general population can perform"; or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 CFR § 1630.2(j) (2001). In determining whether an individual is substantially limited in a major life activity, the regulations instruct that the following factors should be considered: "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." §§ 1630.2(j)(2)(i)-(iii).
> . . . . "Major life activities" thus refers to those activities that are of central importance to daily life.

Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195-97 (2002).

As to the second step of the test, a court evaluating a plaintiff's status as a qualified individual must conduct its analysis as of the time of the alleged discriminatory act. Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 884 (6th Cir. 1996). Plaintiff must show "(1) that he 'satisfies the prerequisites for the position [he holds or desires], such as possessing the appropriate educational background, employment experience, [and] skills ...'; and (2) that he

11

'can perform the essential functions of the position held or desired, with or without reasonable accommodation.'" Burns v. Coca-Cola Enters., Inc., 222 F.3d 247, 256 (6th Cir. 2000) (quoting Dalton v. Subaru-Isuzu Auto., Inc., 141 F.3d 667, 676 (7th Cir. 1998)). "'The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires,' but it does not include only marginal functions." Hoskins v. Oakland County Sheriff's Dept., 227 F.3d 719, 726 (6th Cir. 2000) (quoting C.F.R. §1630.2(n)(1)).

Finally, with respect to the third factor of the disability analysis, the Sixth Circuit has examined such factors as whether the defendant's proffered reason for the adverse employment action is pretext, and if there is direct evidence of disability discrimination to determine if a plaintiff has suffered an adverse employment decision because of his disability. This is so despite the fact that plaintiff is not officially required to prove pretext until after the burden of production has shifted to the defendant to articulate a legitimate non-discriminatory reason for the adverse action, as well as whether the plaintiff has provided any direct or affirmative evidence connecting that action to the plaintiff's disability. See Holiday v. City of Chattanooga, 206 F.3d 637, 646-647 (6th Cir. 2000) (analyzing the third factor of plaintiff's *prima facie* case, and holding that the employer's proffered reason could be "mere pretext," and that plaintiff provided "direct evidence" of discrimination).

Once the Plaintiff has established a *prima facie* case under the ADA, a presumption of discrimination arises, and the defendant may rebut that presumption by introducing "evidence of a legitimate, nondiscriminatory reason for its challenged actions." Gavalik v. Continental Can Co., 812 F.2d 834, 853 (3d Cir. 1987). The burden is then on Plaintiff to show the reason proffered was merely pretextual. "To so demonstrate, the plaintiff must prove 'that the

12

[employer's] asserted reasons have no basis in fact, that the reasons did not in fact motivate the discharge, or, if they were factors in the [employer's] decision, that they were jointly insufficient to motivate the discharge.'" Hoskins, 227 F.3d at 731 (quoting Warfield v. Lebanon Corr. Inst., 181 F.3d 723, 729 (6th Cir. 1999)).

The first step in the analysis requires the Court to determine if Plaintiff is a qualified individual with a disability within the meaning of the ADA. In order to qualify as a person with a disability under the ADA, an individual must have a "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2). The Supreme Court has held that the individualized determination of disability focuses on the medical condition's actual effect on the specific plaintiff. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 488-89 (1999) (holding that mitigating or corrective measures must be taken into account in judging whether an individual possesses a disability because doing otherwise would "run[ ] directly counter to the individualized inquiry mandated by the ADA"); Murphy v. United Parcel Serv., Inc., 527 U.S. 516 (1999) (holding that a truck driver with high blood pressure did not suffer a "disability" under the ADA where the medication he took allowed him to perform major life activities without substantial limitation); Albertsons, Inc. v. Kirkingburg, 527 U.S. 555 (1999) (holding that the ADA imposes a statutory obligation to determine the existence of disabilities on a case-by-case basis, based upon the actual effect of the impairment on the life of the individual in question). Thus, whether a plaintiff has a disabling condition is an individualized inquiry. Sutton, 527 U.S. at 483. Although depression, stress, and anxiety might not be a disability for everyone who has it, it might be a disability for Mohr. See Cotter v. Ajilon Svcs., Inc., 287 F.3d 593, 598 (6th Cir. 2002). The Court must also take into

account "measures that mitigate the individual's impairment; thus, Plaintiff's condition must be viewed in its medicated state. Id. at 475.

A physical or mental impairment is defined as: "Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2). Plaintiff was diagnosed with Severe Recurrent Major Depressive Disorder on April 25, 2001.

Defendant argues that Plaintiff is not a qualified individual with a disability because his depression was of a temporary nature with symptoms controlled by medication and therapy. Plaintiff contends that his therapy and medication did not mitigate his impairment because he continued "to experience feelings of hopelessness, worthlessness, or inappropriate guilt, depressed affect, diminished interest in or enjoyment of activities, lack of energy, poor concentration and indecisiveness, social withdrawal, and low self esteem." Pl's. Ex 3, Records of Dr. Farra, pp. W4. For purposes of this summary judgment motion, looking at the facts in a light most favorable to Plaintiff, Plaintiff's impairment was not fully corrected by his medication and therapy.

If an individual has a physical or mental impairment, that impairment must substantially limit a major life activity in order for an individual to qualify as a person with a disability under the ADA. Plaintiff alleges that his mental impairments have substantially limited the major life activity of working because his condition precludes him from holding a broad category of supervisory or management positions. Plaintiff has not shown, or alleged, that his mental impairments considerably or profoundly limit his ability to perform any other major life activities.

14

The terms "substantially" and "major," "need to be interpreted strictly to create a demanding standard for qualifying as disabled" under the ADA. Williams, 534 U.S. at 197.

> (3) With respect to the major life activity of working--
> 	(i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the
> 	(ii) In addition to the factors listed in paragraph (j)(2) of this section, the following factors may be considered in determining whether an individual is substantially limited in the major life activity of "working":
> 		(A) The geographical area to which the individual has reasonable access;
> 		(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
> 		(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2.

"Because of the problems surrounding 'working,'" as a major life activity, the Court shall "treat it as suggested by the EEOC, as a residual category resorted to only when a complainant cannot show she or he is substantially impaired in any other, more concrete major life activity." Mahon v. Crowell, 295 F.3d 585, 590 (6th Cir. 2002).

To be substantially limited in the major life activity of working, a plaintiff must be precluded from more than one type of job, a specialized job, or a particular job of choice. "If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs." Sutton, 527 U.S. at 492.

"To determine if the claimant is precluded from a substantial class or broad range of jobs, we compare his access to jobs to the access available to a non-injured individual with similar training and experience, looking specifically to the labor market in the claimant's geographic vicinity." Mahon, 295 F.3d at 591. However, the Court ". . . would be using a less-than-demanding standard were we to find [Plaintiff] substantially limited in working when he is still qualified for over half the jobs he was qualified for before his injury." Id., at 592. Plaintiff has a GED, is a licensed salesman for Prime Comfort Insulation Company, has worked as a salesman for Laidlaw Waste Systems, a clothing company, a car dealer, and an insurance company, worked as a groundskeeper, worked with troubled children, and worked as a liquor stock clerk for the now defunct Michigan Liquor Control Commission's warehouse.

His access to jobs, compared to a non-injured individual with similar training and experience is not substantially limited because of his alleged disability. Indeed, there is very little in Plaintiff's training and experience that would qualify him for management positions. In fact, Plaintiff admitted that he may not have been qualified for the Storekeeper 8 position because of a "[l]ack of training" and "[p]ossible inexperience on my part." Dep. of Mohr, Ex. 9, Employee Accident Report. "If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs." Mahon, 295 F.3d at 591 (citing Sutton, 527 U.S. at 492). A host of different jobs are available to Plaintiff that utilize his skills, and thus, Plaintiff is not precluded from a broad range of jobs. Therefore, Plaintiff does not meet the strict of interpretation of "major life activity" and "substantially limits" in the demanding standard used determine if an individual is disabled. See

Sutton, 534 U.S. at 197, Mahon, 295 F.3d at 592.

Because Plaintiff's mental impairments do not substantially limit the major life activity of working, he is not a qualified individual with a disability as defined by the ADA, and his disability discrimination claims fail.

## IV. CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment and Motion to Dismiss is **GRANTED.**

>       s/Marianne O. Battani
>       MARIANNE O. BATTANI
>       UNITED STATES DISTRICT JUDGE

DATED: April 11, 2006

## CERTIFICATE OF SERVICE

Copies of this Order were served upon James P. Bartlett and Cynthia A. Arcaro on this date by ordinary mail and/or electronic filing.

>       s/Bernadette M. Thebolt
>       DEPUTY CLERK